Teodore Dorotee AUTERA, Appellant,

v.

Manuel Dudley ROBINSON et al., Appellees.

Anthony C. AUTERA, Appellant,

v.

Manuel Dudley ROBINSON et al., Appellees.

Nos. 21802, 21847.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 22, 1969.

Decided June 30, 1969.

Mr. Rufus W. Peckham, Jr., Washington, D. C., with whom Mr. Carl L. Shipley, Washington, D. C., was on the brief, for appellants.

Mr. Bond L. Holford, Washington, D. C., with whom Mr. Donald J. Caulfield, Washington, D. C., was on the brief, for appellees.

Before WRIGHT, LEVENTHAL and ROBINSON, Circuit Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

In an action for negligence brought by appellants, husband and wife, against appellees, the District Court entered a judgment for $4,000 in appellants' favor on appellees' motion alleging an oral agreement to settle the case at that amount.[1] The negligence claim, never itself litigated, was simultaneously dismissed with prejudice. Appellants assail this disposition on the grounds that the parties never made a legally binding bargain, and that the attorney who then represented appellants[2] had no authority to commit them to such an arrangement.

On the night of December 19, 1963, an automobile operated by appellee Manuel Dudley Robinson and owned by appellee Catherine Pierce struck appellant Teodore Dorotee Autera while she was crossing an icy street. Mrs. Autera averred that she sustained permanent bodily injuries, and pressed for consequential damages of $30,000. Her husband sought damages of $10,000 for loss of services and consortium and for out-of-pocket medical expenses. Appellees denied negligence, asserting that Mrs. Autera's injuries resulted from an unavoidable accident. Appellants joined in a demand for a jury trial of the issues thus framed.

Subsequently, appellees submitted a verified "Motion for Entry of Judgment in Accordance with the Agreement of the Parties" alleging that on June 5, 1967, appellants' then attorney had orally accepted appellees' oral offer to compromise all claims for $4,000, payable upon the execution of releases and dismissal of the suit with prejudice. The motion further alleged that both appellants had authorized the attorney to accept the proposal, and that Mrs. Autera had signed a release. Appellants, by new counsel,[3] filed a statement in opposition to the motion, asserting that no agreement on settlement had ever been reached, and supported the motion by affidavits from each appellant. One affidavit stated in substance that Mrs. Autera did not understand the purport of the offer, and the other that Mr. Autera never accepted or authorized an acceptance.[4]

---

1. Lawsuits may, of course, be compromised by oral contract. "[I]t is well settled that the compromising of legal proceedings and the relinquishment of rights in connection therewith * * * are such part performance of an oral agreement as to except it from the operation of the statute of frauds." Schanck v. Jones, 97 U.S.App.D.C. 148, 149, 229 F. 2d 31, 32 (1956). See also Main Line Theaters v. Paramount Film Distrib. Corp., 298 F.2d 801, 802 n. 1 (3d Cir.), cert. denied 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962). It is, of course, possible that, as a matter of intention of the parties, no contract of settlement will arise until the agreement is reduced to writing and signed. Dolge v. Masek, 70 Nev. 314, 268 P.2d 919 (1954). And see Vece v. De Biase, 46 Ill.App.2d 248, 197 N.E.2d 79, 81, appeal dismissed 31 Ill.2d 542, 202 N.E.2d 482 (1964).

2. The attorney who represented appellants in the settlement negotiations was discharged, and new counsel was substituted, prior to the hearing on the motion.

3. See note 2, supra.

4. The allegations contained in appellants' affidavits are specified in greater detail in Part II hereof.

A hearing on the motion was convened, the presentations at which consisted of brief remarks by counsel for the parties and by the supplanted attorney who accepted the offer on appellants' behalf. There was no cross-examination by any party's counsel of anyone else who spoke, and no testimony in the sense of statements under oath. The five-minute proceeding[5] was climaxed by the representations of appellants' original attorney:

> We had Mrs. Autera in our office on several occasions explaining the settlement to her, and she is a very learned woman. * * * She agreed to it. We mailed her the authorization and she signed it. * * * Her husband was contacted by phone in New York and he said, "Sure, go ahead, do anything my wife wants." Mr. and Mrs. Autera were separated at that time and were not speaking to each other, and he said he didn't want to have anything to do with it. He said anything she wanted he would agree to.

The attorney stated further that he mailed the release and praecipes of dismissal to Mr. Autera who "then called us the next day and decided that he did not want to sign them and he would not return them to us."

Without further ado, the District Judge granted appellees' motion and entered a $4,000 judgment for appellants on the basis that the parties had agreed to settle at that figure.[6] After the denial of appellants' motion for reconsideration and vacation of the judgment, this appeal *in forma pauperis* brought the case to us.

I

■ Voluntary settlement of civil controversies is in high judicial favor.[7] Judges and lawyers alike strive assiduously to promote amicable adjustments of matters in dispute, as for the most wholesome of reasons they certainly should. When the effort is successful, the parties avoid the expense and delay incidental to litigation of the issues; the court is spared the burdens of a trial, and the preparation and proceedings that must forerun it.[8] By the same token, there is everything to be gained by encouraging methodology that facilitates compromise.

That vast numbers of cases are annually terminated without trial is a tribute to both the trial bench and the practicing bar. As is inevitable, problems concerning settlement do arise in particular instances, but in overwhelming part they are readily accommodated by nonlitigative processes. For the most part, they are thrashed out by counsel themselves; and trial attorneys as a group are aware of the readiness of the courts to lend a helping hand, and of the role that judges, if need be, can play in the resolution of the difficulties. We ourselves could hardly afford to do less than nurture the conditions that for so many years have fostered the machinery of compromise as we know it today.

■ Occasionally, however, a dispute over settlement reaches such a degree of intensity that informal, ad hoc procedures are inadequate to cope with it. Even in these relatively few instances, the litigants may dispense with a good deal of the conventionality normally de-

---

5. The transcript of the hearing shows that it commenced at 10:48 a. m. and was concluded at 10:53 a. m.

6. The District Judge found as a fact "that settlement negotiations were entered into between the parties and that a settlement was agreed upon with the full knowledge and authority of the plaintiffs on or about June 5, 1967, * * *."

7. Williams v. First Nat'l Bank, 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910); St. Louis Mining & Milling Co.

v. Montana Mining Co., 171 U.S. 650, 656, 19 S.Ct. 61, 43 L.Ed. 320 (1898); Moses-Ecco Co. v. Roscoe-Ajax Corp., 115 U.S.App.D.C. 366, 371, 320 F.2d 685, 690 (1963); Clark v. Barlow, 74 App.D.C. 328, 332, 122 F.2d 337, 341, cert. denied 314 U.S. 675, 62 S.Ct. 188, 86 L.Ed. 540 (1951); McMahon v. Matthews, 48 App. D.C. 303, 309 (1919).

8. See generally 6A A. Corbin, Contracts § 1278 (1962).

manded in the judicial system. In many federal courts, the practice has developed, in lieu of a full-dressed proceeding to compel observance of a settlement agreement, of bringing the dispute on less formally for handling by the trial judge. It is now well established that the trial court has power to summarily enforce on motion a settlement agreement entered into by the litigants while the litigation is pending before it.[9] Quite obviously, so simple and speedy a remedy serves well the policy favoring compromise, which in turn has made a major contribution to its popularity.[10]

Yet it is apparent that the summary procedure for enforcement of unperformed settlement contracts is not a panacea for the myriad types of problems that may arise. The summary procedure is admirably suited to situations where, for example, a binding settlement bargain is conceded or shown, and the excuse for nonperformance is comparatively unsubstantial.[11] On the other hand, it is ill-suited to situations presenting complex factual issues related either to the formation or the consummation of the contract, which only testimonial exploration in a more plenary proceeding is apt to satisfactorily resolve. We commend the summary practice for use in connection with problems capable of precise resolution without attendant hazard to the interests of the parties. At the same time, it is evident that beyond that point the convenience of the summary procedure must yield to the exigencies of safeguarding all legally protected rights that are involved.

## II

It was not clear that appellants and appellees were in mutual accord on settlement of their controversy, nor did the hearing on the motion do much to clarify that matter. The District Judge seems to have relied, quite understandably, upon the statement of the attorney who represented appellants during the settlement negotiations. But substantial issues of a factual nature, material to the validity of any agreement on settlement, were raised in the affidavits appellants presented to the court. Just what consideration the judge may have given to this facet of the situation is not at all apparent.

Mrs. Autera maintained in her affidavit that she acceded to the compromise and signed the release while in a distraught frame of mind occasioned by the combination of her injuries and her financially destitute condition.[12] She averred, too, that she did not understand that from the $4,000 to be remitted on settlement all past and future medi-

9. Kelly v. Greer, 365 F.2d 669, 671 (3d Cir. 1966), cert. denied 385 U.S. 1035, 87 S.Ct. 772, 17 L.Ed.2d 682 (1967); Cia Anon Venezolana De Navegacion v. Harris, 374 F.2d 33, 36 (5th Cir. 1967); Cummins Diesel Michigan, Inc. v. The Falcon, 305 F.2d 721, 723 (7th Cir. 1962); Ingalls Iron Works Co. v. Ingalls, 177 F.Supp. 151 (N.D.Ala.1959), aff'd 280 F.2d 423 (5th Cir. 1960); McKenzie v. Boorhem, 117 F.Supp. 433 (W. D.Ark.1954); Beirne v. Fitch Sanitarium, Inc., 167 F.Supp. 652 (S.D.N.Y. 1958). See also Skyline Sash, Inc. v. Fidelity & Cas. Co., 267 F.Supp. 577 (W. D.Pa.1966), aff'd 378 F.2d 369 (3d Cir. 1967).

10. "A compromise or settlement of litigation is always referable to the action or proceeding in the court where the compromise was effected; it is through that court the carrying out of the agreement should thereafter be controlled. Otherwise, the compromise, instead of being an aid to litigation, would be only productive of litigation as a separate and additional impetus." Melnick v. Binenstock, 318 Pa. 533, 179 A. 77, 78 (1935).

11. A typical situation is where there is no factual dispute and no legal defense to enforcement.

12. Mrs. Autera referred to "her pitiable financial circumstances, * * * which have necessitated her requesting public assistance from the District of Columbia Welfare Department." Mr. Autera, in his affidavit, referred to "their necessarily having to live temporarily apart due to adverse personal financial circumstances." As we have heretofore noted in the text, this appeal was allowed *in forma pauperis*.

cal expenses and attorney's fees had to be paid.[13] At the hearing on the motion, the representations her then counsel made to the court tended strongly to buttress these claims. She does not speak English well,[14] she was badly injured in the accident,[15] and her ever-growing special damages almost exceeded the sum offered in settlement.[16] The only statements that came close to contradicting her contentions were those of her former attorney to the effect that he explained the settlement to her, that she signed a settlement authorization and a release, and that she "is a very learned woman." [17] The conflicting indications as to Mrs. Autera's understanding of the transactions and the reality of her ostensible acceptance of the amount tendered in settlement—and, of course, the consequent authority of her attorney to accept the offer in her behalf [18]—raised a substantial issue for appropriate determination.

The hearing also developed sharply conflicting versions as to the extent and character of Mr. Autera's participation in the settlement transaction. According to his former attorney, Mr. Autera,

when contacted by long-distance telephone,[19] said "Sure, go ahead, do anything my wife wants," adding that "he didn't want to have anything to do with it. He said that anything she wanted he would agree to." The releases and praecipes for dismissal were mailed to him, but "[h]e then called us the next day and decided that he did not want to sign them and he would not return them to us." On the other hand, Mr. Autera avows in his affidavit "[t]hat at no time did he authorize anyone to settle his or his wife's claim in the pending action for $4,000.00," and "[t]hat he specifically advised his wife not to make a settlement for that figure." This, as much as Mrs. Autera's affidavit, posed for appropriate decision an issue as to whether Mr. Autera had ever agreed to the compromise or authorized anyone to accept it in his behalf.

### III

Wholly on the basis of the factual offerings at the hearing on the motion to enforce the settlement pact, the District Judge made the finding that led to the judgment under review. Those

13. If indeed Mrs. Autera's ability to understand the settlement arrangement was affected either by her financial condition or her physical disabilities, those circumstances would be factors in ascertaining the validity of the agreement. Compare Gill v. Seaboard Air Line R. R., 208 F. 2d 7, 12 (4th Cir. 1953).

14. In her affidavit, Mrs. Autera states that she is a naturalized American citizen.

15. Responding to the court's question as to what Mrs. Autera's permanent injuries were, her counsel informed that "[s]he is crippled, your honor. She has got a broken leg and walks now with two canes."

16. Counsel represented to the court at the hearing that he had receipts for $3,100 paid in medical expenses, that Mrs. Autera was receiving further medical attention for which he did not have the bills but that they were approximately $500. At the oral argument before us, we were informed that Mrs. Autera's expenses exceeded considerably the $4,000 offered in settlement.

17. Of course, a valid settlement agreement, once reached, cannot be repudiated by the parties, and after a binding settlement agreement has been made, the actual merits of the settled controversy are without consequence. See the cases cited *supra* note 9.

18. "The law is settled that an attorney of record may not compromise, settle, or consent to a final disposition of his client's case without express authority." Thomas v. Colorado Trust Deed Funds, Inc., 366 F.2d 136, 139 (10th Cir. 1966). See also Engelhardt v. Bell & Howell Co., 299 F.2d 480, 483 (8th Cir. 1962); Whitebird v. Eagle-Picher Co., 258 F. Supp. 308, 311 (N.D.Okla.1966). Although, "[p]rima facie, the act of the attorney in making such compromise and entering or permitting to be entered such judgment is valid, because it is assumed the attorney acted with special authority, but when it is proved he had none, the judgment will be vacated on that ground." United States v. Beebe, 180 U. S. 343, 352, 21 S.Ct. 371, 374, 45 L.Ed. 563 (1901).

19. See note 12, *supra*.

offerings, we reiterate, were the statements of the parties' counsel, the statement of appellants' former counsel, appellees' verified motion and appellants' affidavits. Had no factual dispute arisen to plague the parties' substantive rights, we would perceive no difficulty in the judge's acceptance, as a predicate for his action, of the facts represented through statements by members of the bar and affidavits of the parties or others. In this case, however, despite the factual questions developing as the hearing moved along,[20] no opportunity was afforded anyone to test any representation by the chastening process of cross-examination.

The crucial finding made by the District Judge was "that settlement negotiations were entered into between the parties and that a settlement was agreed upon with the full knowledge and authority of the plaintiffs. * * * "[21] True it is that the findings were justified by the statement made by appellants' former counsel, but only if the countervailing version set forth in appellants' affidavits was completely rejected. As is evident, that finding was, as it had to be, the product of a selection unbenefited by built-in aids to a discriminating choice. The opportunity to judge credibility was nonexistent as to the absent affiants; the opportunity to probe by cross-examination was completely lacking. Without these twin tools, normal in the trial of factual issues, the factual conclusion was certain to take on an unaccustomed quality of artificiality.

Appellees' motion called upon the court to determine whether the parties had mutually assented to settle appellants' negligence claim and, if so, the terms upon which they had agreed. In our view, counsel's statements, the affidavits, and the verified motion [22] stood on substantially the same plane as nontestimonial presentations of fact. As such, by legal principles with deep roots in antiquity, neither was an acceptable mode of proof of the facts in issue.[23] We recognize, of course, that trial judges have a discretion to hear and determine ordinary motions either on affidavits or oral testimony portraying facts not appearing of record.[24] We note, however, that an attempted resolution of factual disputes on conflicting affidavits alone may pose the question whether the discretion was properly exercised.[25] Much more emphatically do the decisions disapprove factual determinations derived by weighing affidavits when the motion is more than routine.[26]

20. See Part II, *supra.*

21. See note 6, *supra.*

22. A verified motion is comparable to an affidavit. See 2A J. Moore, Federal Practice ¶ 11.04 (2d ed. 1953).

23. See Downey v. United States, 67 App. D.C. 192, 202, 91 F.2d 223, 233 (1937); Lucas v. Swan, 67 F.2d 106, 110, 90 A.L.R. 210 (4th Cir. 1933); United States Fidelity & Guar. Co. v. Commercial Nat'l Bank, 55 F.2d 564, 566 (5th Cir. 1932); NLRB v. Rath Packing Co., 123 F.2d 684, 685 (8th Cir. 1941); United States v. Grant, 286 F.2d 157, 158 (9th Cir. 1961).

24. "When a motion is based on facts not appearing of record the court may hear the matter on affidavits presented by the respective parties, but the court may direct that the matter be heard wholly or partly on oral testimony or depositions." Fed.R.Civ.P. 43(e).

25. See Collins v. New York Cent. Sys., 117 U.S.App.D.C. 182, 185, 327 F.2d 880, 883 (1963); Urquhart v. American-La France Foamite Corp., 79 U.S.App.D.C. 219, 221, 144 F.2d 542, 544, cert. denied 323 U.S. 783, 65 S.Ct. 273, 89 L.Ed. 625 (1944); Surpitski v. Hughes-Keenan Corp., 362 F.2d 254, 255–256 (1st Cir. 1966); Elliott v. United Employers Cas. Co., 35 F. Supp. 781, 782 (S.D.Tex.1940).

26. As an excellent example, the decision of factual issues on a motion for a preliminary injunction simply by consideration of conflicting affidavits is widely disapproved. See SEC v. Frank, 388 F. 2d 486, 490–492 (2d Cir. 1968); Industrial Electronics Corp. v. Cline, 330 F.2d 480, 483 (3d Cir. 1964); Washington Professional Basketball Corp. v. National Basketball Ass'n, 131 F.Supp. 596, 599 (E.D.N.Y.1955).

A motion to enforce a settlement contract is neither ordinary nor routine. It is the modern counterpart of the olden practice involving supplemental pleadings and formal trial or hearing of the issue as thus developed.[27] Its relative simplicity is a concession to the policy favoring settlements,[28] but only to the extent that full and fair opportunities to prove one's point are substantially preserved.[29] The parties on both sides of appellants' lawsuit had valuable interests at stake in the motion proceeding entertained by the District Court. To the extent that their several representations to the court left issues of fact for determination, they are entitled to an evidentiary hearing.[30]

The judgment appealed from is accordingly reversed, and the case is remanded to the District Court for proceedings not inconsistent with this opinion.

Reversed.

27. See, *e. g.,* Coburn v. Cedar Valley Land & Cattle Co., 138 U.S. 196, 221–223, 11 S.Ct. 258, 34 L.Ed. 876 (1891). See also Kelsey v. Hobby, 41 U.S. (16 Pet.) 269, 277, 10 L.Ed. 961 (1842).

28. See the text *supra* at notes 7–10.

29. See Rosen v. Grand, 6 A.D.2d 799, 175 N.Y.S.2d 441 (1958) ; Accarino v. Hirsch, 6 A.D.2d 795, 175 N.Y.S.2d 435 (1958) ; Freudenberg v. Trattler, 249 App.Div. 584, 293 N.Y.S. 214, 215 (1937). Compare Callaway v. Hamilton Nat'l Bank, 90 U.S.App.D.C. 228, 231 n. 2, 195 F.2d 556, 559 n. 2 (1952).

30. With the question not presented on this appeal, we intimate no view as to whether there is a right to a trial by jury of the factual issues that remain in dispute. See Main Line Theaters v. Paramount Film Distrib. Corp., *supra* note 1, 298 F.2d at 804.