T.C. Memo. 2006-187

UNITED STATES TAX COURT

RHETT RANCE SMITH AND ALICE AVILA SMITH, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11902-05.                    Filed August 31, 2006.

Robert J. Stientjes, for petitioners.

Anne W. Durning and Henry N. Carriger, for respondent.

MEMORANDUM OPINION

GERBER, Judge:  Petitioners, in a motion filed March 13, 2006, sought the entry of a decision in accord with a purported settlement of this case.[1]  Respondent, by means of a notice filed

_____

[1] This case is related to several other cases, two of which involve these same petitioners at docket Nos. 13227-05 and 13228-05.

April 5, 2006, objected, and the parties presented their views in documents, the last of which was filed July 3, 2006. The question presented by the parties' controversy is whether petitioners and respondent entered into an enforceable agreement to settle any part of this case.

Background

Respondent's examination in this case focused upon whether petitioners were entitled to certain contribution deductions that they claimed on their Federal tax return. In the notice of deficiency, respondent determined that petitioners were not entitled to deductions for cash contributions claimed on their 2002 joint Federal income tax return. This case was being handled in Omaha, Nebraska (Omaha case). The examination in the Omaha case involved only the substantiation of cash contribution deductions. Respondent had examined earlier taxable years of petitioners, and in those cases the deductibility of noncash contributions was in controversy. Respondent's counsel in the Omaha case was Henry N. Carriger. At the time of the events we consider here, petitioners' earlier tax years that had already been petitioned to this Court were scheduled for trial in Phoenix, Arizona, and were being handled by a different counsel for respondent, Anne W. Durning (Phoenix cases).

On June 28, 2005, petitioners' petition in the Omaha case was filed, and their representatives thereafter began working

with respondent's Appeals Officer Laura M. Gonzalez in Omaha to administratively resolve the cash contribution issues determined in the notice of deficiency and raised by the pleadings.  Ms. Gonzalez requested substantiation of the cash contribution deductions claimed on petitioners' return.  In particular, she requested receipts or evidence of payment and information showing that any entity to which a contribution was made was one that qualified under section 501(c)(3).[2]

Following the exchange of multiple letters between the parties, on January 6, 2006, one of petitioners' representatives, Attorney Eric Johnson, sent Ms. Gonzalez a letter which, in pertinent part, contained the following:

> I propose that we settle this case.  I think it would be fair for the government to agree that the taxpayers may deduct as a charitable contribution the $74,200 paid to Open Heaven Ministries for tax year 2002.  As stated in my letter of August 23, 2005, the itemized list of contributions made by the taxpayers after the Service Center contact totals $223,906, which is somewhat less than the $226,774 reported on the income tax return, and of that $223,906, the taxpayers are unable now to produce substantiation for $1,825, which leaves $222,081 in substantiated contributions.  The taxpayers hereby offer to settle this case on the basis that they are entitled to $222,081 of the charitable contribution of $226,774 reported on the return.
>
> If you are not satisfied with various aspects of the Open Heaven Ministries issue, we would invite a counter-offer from the government containing a percentage disallowance of the Open Heaven Ministries contribution deduction for 2002 reflecting what the

---

[2] Section references are to the Internal Revenue Code as amended and in effect for the period under consideration.

> government views as its hazards. Although we feel that
> the right answer given the facts is that the taxpayers
> are entitled to the deduction in full, we recognize
> that as a practical matter proving that entitlement at
> this point through litigation would likely be cost-
> prohibitive.
>
> Please contact me with any questions or to discuss. I
> would appreciate a response by the end of the month.

Shortly thereafter, on January 26, 2006, Ms. Durning moved to continue the trial of the Phoenix cases, and the Court gave petitioners until February 21, 2006, to respond to respondent's continuance motion.[3]

Between January 6 and February 21, 2006, petitioners' attorney, on several occasions, unsuccessfully attempted to contact Ms. Gonzalez by telephone. On February 21, 2006, Attorney Robert Stientjes, a counsel for petitioners, contacted Mr. Carriger, counsel for respondent in the Omaha case, to solicit a response to the January 6, 2006, offer made to Ms. Gonzalez.

At this point, the parties' allegations as to what transpired are diametrically opposed. Petitioners contend that, during the February 21, 2006, telephone conversation, Mr.

---

[3] Although petitioners attempt to link respondent's continuance motion in the Phoenix cases to the Omaha case and the purported acceptance of their offer to settle, the circumstances we consider do not support such a connection. Even if petitioners could show or believe such a connection existed, we do not find that fact decisive one way or the other with respect to whether there was a meeting of the minds and a settlement of the cash contribution issue or the Omaha case.

Carriger stated to Mr. Stientjes that "[w]e have a settlement." Petitioners also allege that during a March 2, 2006, telephone conversation, Mr. Carriger admitted that he had accepted petitioners' settlement offer. Petitioners also admit that before the March 2 conversation, Mr. Carriger advised Mr. Stientjes, in a telephone message, that respondent intended to raise a new issue. Petitioners also contend that Mr. Carriger attempted, during the March 2, conversation, "to retract his admissions and claimed that he did not unequivocally accept the settlement offer during the February 21, 2006 teleconference."

Respondent, on the other hand, contends that, at the time of the February 21 conversation, Mr. Carriger was "aware that Appeals Officer Gonzalez had nearly completed her review of the documentation submitted for the cash contributions and that a settlement seemed likely." Respondent also alleges that Mr. Carriger was "unaware of the January 6, 2006 offer letter and of the details of what a settlement might be." With those premises, respondent contends that Mr. Carriger, during the February 21 conversations, "reported to * * * [Attorney] Stientjes that 'settlement was looking good.'" In essence, respondent's position is that Attorney Carriger "had no basis to reach a meeting of the minds on the matter as he had not reviewed the documentation submitted."

Respondent, through affidavits from the employees involved, has stated that at the time of the February 21, 2006, telephone conference: (1) Ms. Gonzalez and her supervisor had not recommended or approved a settlement of part or all of the Omaha case; (2) Mr. Carriger was unfamiliar with the specifics of the settlement offer and the exchanges between Appeals and petitioners' representatives; (3) the provisions of Rev. Proc. 87-24, 1987-1 C.B. 720, direct that Appeals attempt to settle cases and that Government counsel normally does not settle cases until the administrative files are returned to Government counsel; (4) petitioners' counsel contacted Ms. Gonzales 6 days after the February 21 telephone conference and asked whether she had made a determination about the January 6 offer; (5) petitioners did not confirm the alleged oral settlement by means of a followup letter or memorandum reflecting the terms thereof; (6) petitioners' counsel agreed to a continuance of petitioners' Phoenix cases on February 15, 2006 (6 days before the February 21 teleconference).

Between the February 21 and the March 2, 2006, conversations, Mr. Carriger left a message for Mr. Stientjes advising that, in addition to the cash contribution issue raised in the notice of deficiency, respondent intended to affirmatively raise a non-cash-contribution issue in the Omaha case that was the same as or similar to the issues pending in petitioners'

Phoenix cases.  Petitioners had the same representatives in all pending cases, whereas respondent was represented by Ms. Durning in the Phoenix cases and Mr. Carriger in the Omaha case.

Mr. Stientjes (without respondent's counsels' knowledge) made a recording of the March 2, 2006, telephone conversation.  A transcript of the conversation was attached to one of petitioners' documents filed in connection with the motion to enforce settlement and entry of decision.  The March 2 conversation began with Mr. Stientjes accusing Mr. Carriger of being "dishonest" for advising on February 21 "that we have a settlement" and subsequently advising that respondent is "going to raise a new issue."  Mr. Carriger, in response to the accusation, stated that he did not think his actions were dishonest "because the issue that we thought we had a settlement on, we do.  Which is the cash contribution.  At the time [February 21, 2006] I was not aware that the noncash contributions were even at issue."

The next matter of substance was Mr. Stientjes's observation to Mr. Carriger that he "can't tell * * * [Mr. Stientjes that] we are settling the only issue in the case and then, a week later, tell * * * [Mr. Stientjes that respondent is] raising a new issue and we haven't settled the whole case a week before."  Mr. Carriger responded that there was no prohibition upon the raising of an issue after settlement of the sole issue in the case.

Later in the same conversation, after Mr. Stientjes advised that he would file a motion to enforce settlement, Mr. Carriger checked his notes of the February 21 telephone conversation and contended that he had not told Mr. Stientjes that the case was settled, but only that "settlement is looking good."  After that point in the conversation, Mr. Carriger's supervisor, Attorney Albert Kerkhove, became active in the conversation.  The matter devolved into a verbal standoff where nothing further was said that is worthy of consideration.  Following these exchanges, petitioners filed a motion to enforce the purported settlement.

Discussion

Petitioners have moved for entry of decision based on a purported settlement agreement in this case.  The question we consider is whether petitioners and respondent have an enforceable agreement that settled either the cash contribution issue or the entire case, so as to prohibit respondent from raising the non-cash-contribution issue.  Petitioners' returns had been audited for earlier tax years, and petitioners had pending Tax Court cases scheduled for trial in Phoenix involving non-cash-contribution deductions.  The subsequent audit of the 2002 year was being handled in a different office of respondent, and the examination resulted in a determination that petitioners were not entitled to cash contribution deductions.  The non-cash-contribution issue was the subject of the cases for earlier

years.  However, while petitioners apparently also claimed non-cash-contribution deductions on their 2002 return, the issue was not raised in the examination, nor were the deductions disallowed in the 2002 deficiency notice.

The 2002 year (Omaha case) moved though the normal administrative procedures and became docketed in this Court at a time when the earlier years' cases (Phoenix cases) were at a more advanced stage of development.  The Omaha and Phoenix cases were being handled by different Government counsel, and different cities had been requested for trial.  In a routine manner, the Omaha case was assigned to Appeals for settlement, and, after exchanges with Appeals, petitioners sent a letter proposing settlement.  Coincidentally, a few weeks later, Government counsel in the Phoenix cases moved to continue the cases from the scheduled Phoenix trial session.  After not being able to obtain a response from Appeals to their 2002 year offer, petitioners contacted Government counsel in Omaha, who was not aware of the non-cash-contribution issues in the Phoenix cases and was not familiar with the details of the negotiations or settlement offer during the Appeals process.  When petitioners' counsel asked respondent's Omaha counsel about the status of the settlement offer, Government counsel made some affirmation that the matter was settled (per petitioners) or that settlement was likely (per respondent).  Considering that scenario with those two possible

endings, we must decide whether there was a settlement, and if so, what was settled; i.e., the cash contribution issue or the entire case.

The general principles involving settlements have been effectively set out in the case of Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320, 330 (1997) (quoting Manko v. Commissioner, T.C. Memo. 1995-10), affd. without published opinion 208 F.3d 205 (3d Cir. 2000), as follows:

> "For almost a century, it has been settled that voluntary settlement of civil controversies is in high judicial favor. Williams v. First Natl. Bank, 216 U.S. 582, 595 (1910); St. Louis Mining & Milling Co. v. Montana Mining Co., 171 U.S. 650, 656 (1898). A valid settlement, once reached, cannot be repudiated by either party, and after the parties have entered into a binding settlement agreement, the actual merits of the settled controversy are without consequence. This Court has declined to set aside a settlement duly executed by the parties and filed with the Court in the absence of fraud or mutual mistake. Stamm Intl. Corp. v. Commissioner, 90 T.C. 315 (1988); Spector v. Commissioner, 42 T.C. 110 (1964). However, a court will not force a settlement on parties where no settlement was intended. Autera v. Robinson, 419 F.2d 1197 (D.C. Cir. 1969).
>
> "A settlement is a contract and, consequently, general principles of contract law determine whether a settlement has been reached. Robbins Tire & Rubber Co. v. Commissioner, 52 T.C. 420, 435-436, supplemented by 53 T.C. 275 (1969). A prerequisite to the formation of a contract is an objective manifestation of mutual assent to its essential terms. Heil v. Commissioner, T.C. Memo. 1994-417; 17A Am. Jur. 2d, Contracts, secs. 27 and 28 (1991); 1 Williston on Contracts, sec. 3:5 (4th ed. 1990). Mutual assent generally requires an offer and an acceptance. 17A Am. Jur. 2d, Contracts, sec. 41 (1991). 'An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent

to that bargain is invited and will conclude it.'
1 Restatement, Contracts 2d, sec. 24 (1981).

"In a tax case, it 'is not necessary that the parties execute a closing agreement under section 7121 in order to settle a case pending before this Court, but, rather, a settlement agreement may be reached through offer and acceptance made by letter, or even in the absence of a writing.' Lamborn v. Commissioner, T.C. Memo. 1994-515. Settlement offers made and accepted by letters are enforced as binding agreements. Haiduk v. Commissioner, T.C. Memo. 1990-506; see also Himmelwright v. Commissioner, T.C. Memo. 1988-114."

In the circumstances we consider here, the authority to settle is not the decisive element of whether a binding contract was formed. Clearly, there was an offer of settlement in the form of the January 6, 2006, letter from petitioners' counsel to Ms. Gonzalez. That offer sought to resolve the only issue then pending in this case--the cash contributions disallowed in the notice of deficiency. It is less clear whether that offer was accepted and/or whether there was a meeting of the minds. It is certain that Ms. Gonzalez did not make a written or oral response, and hence did not accept the offer irrespective of whether she had authority to do so.

To the extent there was an acceptance of the offer, petitioners contend that it was made by Mr. Carriger. In the circumstances of this case, we cannot conclude that Mr. Carriger accepted petitioners' offer. First, the offer was not made to Mr. Carriger. Significantly, the negotiations were conducted by Ms. Gonzalez and not by Mr. Carriger, and he was not aware of the specifics of the offer. Mr. Carriger's response to Mr. Stientjes

during the February 21 conversation was, at best, his understanding of the intent or actions of another person--Ms. Gonzalez or her office. The subsequent discussion between Messrs. Carriger and Stientjes was essentially an argument about whether petitioners' offer of settlement had been accepted.

The essence and focus of the February 21 and March 2, 2006, telephone conversations indicate that petitioners were more concerned about avoiding the new issue (noncash contribution) than merely enforcing the settlement of the cash contribution issue. We are not compelled to consider this subtlety, because we hold that there was no acceptance of the offer, and, hence the entire case could not have been settled. Even though respondent's counsel indicated in the March 2, 2006, telephone conversation that the cash contribution issue was or would be settled, that was after a new issue (the non-cash-contribution issue) had been raised. In any event, it is not sufficiently clear that the cash contribution issue had been settled before the March 2, 2006, conversation.

Although there is precedent that would permit this Court to enforce an oral settlement or acceptance of a settlement offer, it must appear reasonably certain that the parties had agreed or

intended to agree.[4]  In this case, we are not able to find that respondent's agents or representatives either accepted and/or intended to accept petitioners' offer.  Accordingly, we hold that there was no meeting of the minds and no settlement reached by the parties.

To reflect the foregoing,

<u>An order will be issued</u>

<u>denying petitioners' motion for</u>

<u>entry of decision.</u>

---

[4] Needless to say, this matter would likely not be before the Court if both the settlement offer and the acceptance had been in some way memorialized; i.e., committed to writing.